**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| AMERICAN OVERSIGHT,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION,<br>Defendant. | Civil Action No. 18-1272 (CKK) |
|---|---|

**MEMORANDUM OPINION**
(January 11, 2022)

In this Freedom of Information Act ("FOIA") case, Plaintiff American Oversight seeks the unredacted disclosure of communications between Congressional and U.S. Department of Transportation ("DOT") staff in which Congressional staff sought agency input on draft transportation-related legislation. In response to Plaintiff's FOIA request for these documents, Defendant DOT produced several documents redacted, in relevant part, pursuant to FOIA's fifth exemption to disclosure of agency records. That exemption protects "inter-agency or intra-agency memorandums and letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In challenging these redactions, Plaintiff raises two interrelated questions of law regarding the scope of Exemption 5. First, are communications between Congressional and agency staff, in which Congressional staff exchange input on draft legislation that the two staffs are working on together, "inter-agency or intra-agency memorandums or letters?" Second, and if so, do these communications fall within the "deliberative process privilege," i.e., does an agency necessarily "rely" upon those communications to aid in its own policy- or decision-making process? Upon consideration of the

pleadings,[1] the relevant legal authorities, the documents themselves, and the record as a whole, the Court answers both questions in the affirmative. As such, the Court **GRANTS** Defendant's [22] Motion for Summary Judgment and Plaintiff's [24] Cross-Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

On January 10, 2018, Plaintiff submitted a FOIA request to DOT for "[a]ll records reflecting communications (including emails, email attachments, text messages, telephone call logs, calendar invitations/entries, meeting notices, meeting agendas, informational material, draft legislation, talking points, or other materials)" between anyone in DOT's Offices of the Secretary, the Under Secretary of Transportation for Policy, and Governmental Affairs, and "Senator Mitch McConnell or anyone who works for Mr. McConnell." Def.'s Ex. A, Declaration of Michael Bell, Def.'s Mot ("Bell Decl."), at 2. Plaintiff completed its production of responsive records on May 30, 2019. *Id.* As part of its production, DOT redacted several records under, in relevant part, FOIA Exemption 5. The parties agree, and Defendant's *Vaughn* index shows, that the contested documents all reflect emails between staff for Sen. McConnell and DOT staff regarding proposed or draft legislation. The *Vaughn* index indicates the identity of the individuals on each redacted

---

[1] The Court's consideration has focused on the following documents:

- Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, ECF No. 22-1 ("Def.'s Mot.");
- Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Cross-Motion to Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, ECF 24-1 ("Pl.'s Cross-Mot.");
- Defendant's Reply in Support of Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment, ECF No. 26 ("Def.'s Repl.");
- Plaintiff's Reply in Support of Plaintiff's Cross-Motion for Summary Judgment, ECF No. 27 ("Pl.'s Repl.");
- Plaintiff's Supplemental Memorandum, ECF No. 33 ("Pl.'s Supp. Mem."); and
- Defendant's Supplemental Memorandum, ECF No. 34 ("Def.'s Supp. Mem.").

email, the nature of the withheld content, roughly the status of each proposed legislation, and how DOT input on that legislation furthered internal policy deliberation. The documents themselves show as much as well. Plaintiff asserts, and Defendant does not appear to contest in its briefing, that the documents all relate to Congressional requests for input and advice on draft legislation from DOT staff. *See* Def.'s Repl. at 2.

The parties disagree over the significance of Congressional staff requesting information *from* an agency. Defendant's central argument is that Congressional staff played the role of "consultant" in these communications. In other words, Defendant argues, they fall within the "consultant corollary" doctrine of Exemption 5 that permits an agency to redact "communications between an agency and a non-agency that aided the agency's decision-making process." *See Judicial Watch v. U.S. Dep't of Transp.*, 950 F. Supp. 2d 213, 218-19 (D.D.C. 2013). Plaintiff, on the other hand, argues that communications between Congressional and agency staff, particularly where it is Congressional staff who ask for assistance with their own proposed legislation, cannot be inter- or intra-*agency* communications. *See* Pl.'s Mot. at 3. Concerned that Plaintiff might mean to suggest that inquiries from Congress to agencies are not "agency records" within the meaning of FOIA at all, the Court directed the parties to submit supplemental briefing on that subject. The Court further ordered Defendant to provide the Court copies of the communications at issue for examination *in camera*. Having reviewed the documents and the parties' briefing, the Court now turns to the motions' resolution.

## II. DISCUSSION

### A. Summary Judgment Standard

The FOIA authorizes a district court only "to enjoin [a federal] agency from withholding agency records or to order the production of any agency records improperly withheld from the

complainant." 5 U.S.C. § 552(a)(4)(B). This case, like a "vast majority" of FOIA cases, can be decided on summary judgment. *See Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

Summary judgment is appropriate upon a showing that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, the Court may award summary judgment to an agency solely on the information provided in affidavits or declarations when they describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *accord Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *see also Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). Rather, a plaintiff "must point to evidence sufficient to put the agency's good faith into doubt." *Ground Saucer*, 692 F.2d at 771. Otherwise, "'uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail.'" *Schoenman v. FBI*, 841 F. Supp. 2d 69, 80 (D.D.C. 2012) (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (alteration omitted)).

On summary judgment, the district court must conduct a "de novo" review of the record, 5 U.S.C. § 552(a)(4)(B), "to ascertain whether the agency has sustained its burden of

demonstrating that the documents requested . . . are exempt from disclosure." *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (citation and internal quotation marks omitted). "Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents." *Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993). Only after an agency has proven that "it has fully discharged its disclosure obligations" is summary judgment appropriate. *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

B. Exemption 5

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To fall within Exemption 5, "a document must meet two conditions: 'its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it.'" *Stolt-Nielsen Transp. Grp. v. United States*, 534 F.3d 728, 733 (D.C. Cir. 2008) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). In essence, Exemption 5 provides grounds for withholding documents that would fall under a variety of recognized privileges available to Government agencies in civil litigation including, of relevance to this case, the deliberative process privilege. Recently, Plaintiff has aggressively litigated Exemption 5 within the congressional context, and the Court is not the first in this jurisdiction to confront the question. *E.g.*, *Am. Oversight v. U.S. Dep't of Health and Human Servs.*, 380 F. Supp. 3d 45 (D.D.C. 2019) (ABJ) ("*Am. Oversight v. HHS*") (granting summary judgment in favor of plaintiff); *Am. Oversight v. U.S. Dep't of the Treas.*, 474 F. Supp. 3d 251 (D.D.C. 2020) (RBW) ("*Am. Oversight v. Treasury*") (granting summary judgment in favor of defendant).

1. *Agency Solicitation or Indicia of a Consultant Relationship*

Plaintiff first argues that DOT's communications cannot be inter-*agency* communication because, in part, "the statute explicitly excludes Congress from its definition of the term 'agency.'" Pl.'s Cross-Mot. at 5. Both judges in *Am. Oversight v. Treasury* and *Am. Oversight v. HHS* rejected this very same argument. 474 F. Supp. 3d at 262; 380 F. Supp. 3d at 52. As those courts noted, such a holding is contrary to the law of our Circuit. *See, e.g.*, *Pub. Empls. For Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 201 (D.C. 2014) (Kavanaugh, J.). It also fails for a more fundamental reason. If communications with Congress are not "agency" records within the meaning of Exemption 5, then they are not records within the meaning of FOIA. In other words, they are not subject to disclosure *at all*. *See* 5 U.S.C. § 552(1)(A); *Cause of Action v. Nat'l Archives & Records*, 753 F.3d 210, 212 (D.C. Cir. 2014) (explaining that "FOIA does not cover congressional documents, or documents of legislative branch agencies" (cleaned up)). In that regard, Plaintiff's reading would risk creating a fundamental conflict within FOIA. *See Am. Lung Assoc. v. EPA*, 985 F.3d 914, 986 (D.C. Cir. 2021) ("The judicial duty is to read statutory text as a harmonized whole, not to foment irreconcilability.").

In any event, Plaintiff appears to concede in its Supplemental Briefing that the records here are agency records. As Plaintiff explains in its supplemental briefing, "agency records are not limited to records 'generated internally' by the agency, reasoning that such a limitation 'would frustrate Congress' desire to put within public reach the information available to an agency in its decision-making process." Pl.'s Supp. Br. At 3 (quoting *U.S. Dep't of Just. V. Tax Analysts*, 392 U.S. 136, 144-45 (1989)). Contradicting its Cross-Motion for Summary Judgment, Plaintiff further appears to concede, by quoting liberally from DOT's supporting affidavits, "that DOT

'solicited' the information within the contested communications, 'relied on' or 'used' it for agency purposes, and the information contained in the emails 'informed DOT's decision-making.'" *Compare id.* at 4 *with* Pl.'s Cross-Mot. at 11-12.

Even had Plaintiff made no such concession, the Court concludes that the communications here are "inter-agency" records. As the Court of Appeals has explained, "communications between an agency and Congress" fall squarely within Exemption 5 so long as they are otherwise privileged. *See Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 604 (D.C. Cir. 2001) (quoting *Dow Jones & Co. v. U.S. Dep't of Just.*, 914 F.2d 571, 574 (D.C. Cir. 1990)). For these interbranch communications to be intra- or inter-agency, however, the "records exchanged" must either have been (1) solicited by the agency or otherwise received where there is "some indicia of a consultant relationship between" the interbranch staffs, and (2) the records must have been "created for the purpose of aiding the agency's deliberative process."[2] *Am. Oversight v. Treasury*, 474 F. Supp. 3d at 262 (quoting *Judicial Watch, Inc. v. U.S. Dep't of State*, 306 F. Supp. 3d 97, 106-07 (D.D.C. 2018)).

The Supreme Court recognized this second approach to "intra-agency" records as the "consultant corollary doctrine" in *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 2 (2001) and, in the view of some courts, dramatically narrowed the doctrine. Although the scope of *Klamath* is hotly debated to this day, *Klamath*'s holding was limited: the corollary doctrine would not exempt records provided to an agency from a non-agency that had "'had their own . . . interests in mind'" and acted as "'self-advocates at the expense of others seeking benefits inadequate to satisfy everyone.'" *Pub. Empls.*, 740 F.3d at 201. At the same

---

[2] Defendant argues, and Plaintiff appears to concede in its Supplemental Briefing, that DOT solicited at least some communications *from* Congressional staff. *See* Supp. Br. at 4. Nevertheless, most of the communications were solicited by Congressional staff for DOT input on pending legislation, so the Court shall focus its analysis on the consultant corollary doctrine.

time, the Court, in dicta, called into question two prior D.C. Circuit cases. In the first, *Ryan v. Dep't of Just.*, the Court of Appeals held that members of Congress' input on procedures for selecting and recommending judicial nominees was covered under Exemption 5 even though they "unquestionably had their own views and interests." 617 F.2d 781, 784 (1980). In the second, *Pub. Citizen v. DOJ*, the Circuit held that former Presidents' input on their records at NARA were covered, even though there was a "potential for an adversary relationship." 111 F.3d 168, 171 (1977). The Court characterized these two cases as "arguably extend[ing] beyond what we have characterized as typical examples" of the consultant corollary doctrine. 532 U.S. at 12 n.4. After that footnote, at least one Circuit has held that the entire consultant corollary doctrine cannot be reconciled with *Klamath*. *See Lucaj v. FBI*, 852 F.3d 541, 547 (6th Cir. 2017). Others continue to apply the consultant corollary doctrine, if sometimes only in more tailored circumstances. *See, e.g.*, *Jobe v. NTSB*, 1 F.4th 396, 404 (5th Cir. 2021) *cert. petition docketed* No. 21-469 (Sept. 26, 2021); *Rojas v. FAA*, 989 F.3d 666, 676 (9th Cir. 2021) (en banc). The Court of Appeals for the District of Columbia Circuit continues to apply the consultant corollary doctrine, but the degree to which the Court of Appeals has narrowed the doctrine in response to *Klamath* is uncertain.

In prior cases, the Court of Appeals has acknowledged *Klamath* and suggested that it has had some effect on the Court of Appeals' jurisprudence on the corollary doctrine. *See McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336 (2011). This Court has previously observed that *Pub. Citizen* and *Ryan* may be in tension with *Klamath* but nevertheless remain "good law." *People for the Am. Way Found. v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28, 38 (2007); *accord Am. Oversight v. Treasury*, 474 F. Supp. 3d at 267. To that end, Plaintiff's strongest argument that the documents at issue are not covered by Exemption 5 is that the Congressional staff represented their "Senator's own interests and agenda, and the institutional interests of the

legislative branch" as opposed to common interests shared by the respective staffs. Pl.'s Cross-Mot. at 15. If the Court of Appeals now requires that a non-agency interlocutor bring *no* divergent interest to bear, then those facts would strip the instant communications of Exemption 5 protection. The *Am. Oversight v. HHS* court squarely accepted that argument, and the *Am. Oversight v. Treasury* court squarely rejected it.

In support of its holding, the court in *Am. Oversight v. HHS* suggested, in essence, that neither *Pub. Citizen* nor *Ryan* are good law. Its analysis centered on *Pub Empls.*'s characterization that, "[i]n the wake of *Klamath*, [the Court of Appeals] ha[s] confined the consultant corollary to situations where an outside consultant did not have its own interests in mind." 380 F. Supp. 3d at 54 (quoting 740 F.3d at 201-02). "Thus, it appears that the law in this Circuit does require that outside consultants 'lack an independent interest.'" *Id.* Noting that at least two of the emails at issue featured subject lines with parochial interests (e.g., "IL Delegation letter" and "Texas 1115 Waiver"), the Court held that the *Vaughn* index established that the Congressional interlocutors did not "lack" an independent interest. *See id.* at 53-54. As such, the Court held in favor of Plaintiff.

The *Am. Oversight v. Treasury* court disagreed that this Circuit's law required a non-agency interlocutor to have *no* interest distinct from that of the agency. That court explained that this jurisdiction has previously "'recognized that, under some circumstances, a consultant and agency may share common goals such that, even if the consultant appears to be acting to foster its own interest, its actions might also be construed as aiding an agency process.'" 474 F. Supp. 3d at 267 (quoting *Judicial Watch*, 306 F. Supp. 3d at 111). On the whole, the Court concludes that the *Am. Oversight v. Treasury* approach better captures the law of the Circuit as it currently stands and furthers the public's interest in judicial economy.

At the outset, the Court notes that *Pub. Empls.*'s statement that the Court of Appeals "ha[s] confined the consultant corollary to situations where an outside counsel did not have its own interests in mind" is dictum. *See* 740 F.3d at 68-69. The Court's holding on Exemption 5 was limited to a tailored remand ordering the District Court to do further factfinding on the drafter of the documents at issue. The Court also respectfully believes that the statement does not accurately reflect the law then and now. In support of that statement, the *Pub. Empls.* court cited *McKinley*. In that case, the Court of Appeals held that, because the non-agency "did not represent an interest of its own" in advising the agency, Exemption 5 applied. *See* 647 F.3d at 339. The *McKinley* court did *not* hold the converse—that the non-agency must *never* have an interest distinct from that of the agency when discussing policymaking.

The consequences of forcing the district court, as factfinder, to determine whether the non-agency *ever* had "its own interests in mind" when conversing with the agency should not be understated. First, it would require the district court to determine the subjective mindset of an interlocutor relying on nothing more than the communications themselves. In this context, it would require the Court to attempt to find whether any of the Congressional staffers ever considered an interest other than that of the agency when discussing draft legislation with agency professionals. If their subjective view were to become dispositive in actions such as these, the Court could envision subpoenas to Congressional staffers being necessary—even for direct trial testimony.

More practically, and as the court in *Am. Oversight v. Treasury* noted, "under some circumstances, a consultant and an agency may share common goals such that, even if the consultant appears to be acting to foster its own interests." 474 F. Supp. 3d at 268. In other words, when discussing draft legislation, members of the two political branches may share the exact same

goals and desire to further the exact same piece of legislation. Indeed, that was precisely the case in *Am. Oversight v. Treasury* in which the record established that staffers in the Trump Administration and staffers for Republican Congressional leadership both shared the same goals for tax reform legislation. *See id.*

As a result, the Court does not find convincing Plaintiff's attempt to assign talismanic effect to the fact that the congressional staffers here did not "underst[and] themselves to be consultants." Pl.'s Cross-Mot at 12. The Court agrees with the *Am. Oversight v. Treasury* court that the relevant inquiry is, and should be, whether the two staffs were "working together" to achieve a common legislative purpose. 474 F. Supp. 3d at 266 (citing *Judicial Watch, Inc v. U.S. Dep't of Transp.*, 950 F. Supp. 2d 213, 219 (D.D.C. 2013)). The record shows, and Plaintiff concedes, that the two staffs were "working together." Staffers for Sen. McConnell were considering several pieces of draft legislation and sought DOT staff's assistance in drafting and reviewing that legislation. Bell Decl. at 6; *accord* Pl.'s Cross-Mot. at 10; Pl.'s Supp. Br. at 3. Moreover, Defendant avers that it:

> understood the staffers in Leader McConnell's Office to share goals broadly similar to DOT and the administration with respect to infrastructure priorities, and understood that the communications at issue here to be towards a common goal of enacting legislation consistent with the administration's transportation priorities, rather than an attempt of anyone in Leader McConnell's Office to gain a benefit from DOT.

Sullivan Decl. at ¶ 10. Defendant further describes the specific pieces of legislation the two staffs discussed, including "the Fiscal Year 2018 Appropriations Bill," the "FAA reauthorization bill," and the Trump Administration's "Infrastructure Plan" that incorporated draft legislation. *Id.* at ¶¶ 4, 9. As Plaintiff points to no evidence in the record to contest Defendant's supporting affidavits, the Court concludes that the two staffs here were, in fact, working together towards a common legislative purpose. *See Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) (holding "summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity

of detail . . . , and if they are not called to question by contradictory evidence in the record or by evidence of agency bad faith").

As to whether the records were "created in aid of the agency's deliberative process," Plaintiff again concedes as much. As Plaintiff writes, quoting from DOT's "[a]ccording to DOT's own declarations, DOT 'solicited' the information, 'relied on' or 'used' it for internal agency purposes, and the information contained in the emails 'informed' DOT's decisionmaking." Pl.'s Supp. Br. at 4. Nevertheless, Plaintiff insists that Congressional staffers cannot create records "in aid of the agency's deliberative process" because they have "outside interests." Pl.'s Cross-Mot. at 15. This argument is another flavor of Plaintiff's insistence that a non-agency must have no interest but the agency's when communicating with the agency to benefit from Exemption 5 coverage. Here, not only does the mutual flow of advice and technical favor a finding that the two parties were "working together" to achieve a common legislative purpose, *see id.* at 266, it is also stands in stark contrast to the parochial interests that troubled the *Am. Oversight v. HHS* court. In its review of the documents *in camera*, the Court saw no communication to or from Congress that reflected any one member's parochial interests. Rather, each communication discussed advancing common priorities for national transportation legislation. Such a relationship is not the sort of "interested party seeking a Government benefit at the expense of other applicants" that the *Klamath* court held vitiated Exemption 5 coverage. *See* 352 U.S.1, 12 n.4.

That said, the Court agrees with Plaintiff that the consultant corollary doctrine, as applied to Congressional communications, constructs a kind of legal fiction. It is not the case that Congressional staff, when coordinating common legislative goals, effectively become "employees" functioning as "just an employee would be expected to do." *See Rojas*, 989 F.3d at 675. Rather, as Plaintiff takes pains to note, Congressional staff are employed for a separate, co-

equal branch of government. Characterizing staffers, and even members of Congress, may seem to stretch the consultant corollary doctrine beyond its bounds, but the application of the consultant corollary doctrine to Congress furthers FOIA's interests even more than its application to private organizations. Even more than private, temporary hires, interbranch staffers "will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *See Klamath*, 532 U.S. at 8-9. Put differently, Congressional and agency staff *would not* exchange full-throated discussions on common legislative goals if they knew it would be subject to disclosure simply because a "house.gov" or "senate.gov" was cc'ed on an email. As a result, although the doctrine may nominally be called a "consultant corollary," communications between Congressional staff and agency staff on draft legislation where they are working towards common legislative priorities are still "agency" documents for the purpose of Exemption 5.

*2. Deliberative Process Privilege*

The second step of the consultant corollary inquiry is similar to the second part of Exemption 5: whether the communication at issue was prepared to help the agency form a policy position and used as such. *See Am. Oversight v. Treasury*, 474 F. Supp. 3d at 268-69.

The deliberative process privilege is intended to "prevent injury to the quality of agency decisions." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). More specifically, the privilege

> serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). To that end, the privilege protects "documents and other materials that would reveal advisory opinions, recommendations, and deliberations comprising part of the process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).

For the privilege to apply, the government must establish that the material at issue is both "predecisional" and "deliberative" in nature. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785–86 (2021). "A document is predecisional if it was prepared in order to assist an agency decision maker in arriving at his decision, rather than to support a decision already made." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citing *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). A document is deliberative if "it reflects the give-and-take of the consultative process," *Coastal States*, 617 F.2d at 866, and if it was "prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786; *see also Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010) ("To qualify under Exemption 5, a document must also be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.") (internal quotation omitted).

Again, by approvingly quoting from Defendant's supporting affidavits in its Supplemental Briefing, Plaintiff effectively concedes the point. *See* Pl.'s Supp. Br. at 4 ("DOT . . . read or relied upon the emails in connection with the performance of agency functions" and the communications "'informed' DOT's decisionmaking" (quoting Sullivan Decl. at ¶¶ 6-9)). In any event, the Court shall address each requirement.

First, the Court concludes that the documents at issue were predecisional. Defendant states that the communications with Congressional staff helped DOT "evaluate[] and consider[]

transportation initiatives." Sullivan Decl. at ¶ 4. The information exchanged, Defendant avers, was used to "develop a strategy for advancing the Administration's priorities in the Congress, make recommendations for the Administration's position on particular legislative proposals, and develop policy recommendations." *Id.* at ¶ 6. As a result, the interbranch communications were prepared in order to "assist" DOT in determining what legislative details it would support in draft legislation and, ultimately, whether it would support the legislation itself. These communications are quite similar to the communications in *Am. Oversight v. Treasury* that determined and preceded the legislative details Department of Treasury officials would ultimately support in tax reform packages. *See* 474 F. Supp. 3d at 270. Having reviewed the documents themselves *in camera*, and seeing no contrary evidentiary material from Plaintiff, the Court concludes that the documents at issue here are predecisional.

The Court next addresses whether the documents qualify as deliberative. To do so, the Court must determine:

> [1] the roles of the document drafters and recipients in the chain of command, [2] the nature of the withheld content, [3] the stage within the broader deliberative process in which the withheld material operates; and [4] the way in which the withheld material facilitated deliberation.

*Judicial Watch, Inc. v. U.S. Dep't of Just.*, --- F.4th ---, 2021 WL 585618, at *4 (D.C. Cir. 2021) (Tatel, J.) (cleaned up). Having review the documents *in camera*, the Court can conclude that the drafters and recipients were high level legislative staffers within the Office of the Majority Leader and agency staffers within the three DOT offices that are the subject of Plaintiff's FOIA request. As the parties agree, the content of the discussions between congressional and agency staffs on pending and proposed legislation. The proposed legislation included the Fiscal Year 2018 Appropriations Bill," the "FAA reauthorization bill," and the Trump Administration's "Infrastructure Plan" that incorporated draft legislation. Sullivan Decl. at ¶¶ 4, 9. Upon review

of the communications themselves, each draft legislation inhabited a different stage of the process. Some bills were about to proceed to markup, some were still being drafted, and some had yet to be drafted prior to the two staffs discussing their shared legislative priorities in more detail. *See id.* at ¶ 9; Ex. A, Bell Decl. Finally, from the documents themselves and Defendant's supporting affidavits, the Court can determine how the communications facilitated deliberation. Across all these different legislative proposals, the communications "enabled candid and thoughtful discussions about transportation policy issues" both in general and as applied to the draft bills. *See* Sullivan Decl. at ¶ 11. These conversations, like tax-related legislative discussions in *Am. Oversight v. Treasury*, "'reflect[] the give-and-take of the consultative process.'" *See* 474 F. Supp. 3d at 269 (quoting *Coastal States*, 617 F.2d at 866).

Plaintiff's argument to the contrary is unavailing. Plaintiff insists that documents that "precede and inform *legislative*, [and] not administrative actions" cannot further agency deliberation. Pl.'s Cross-Mot. at 26. In support of this argument, Plaintiff cites *Elec. Frontier Found. v. Office of the Dir. Of Nat'l Intelligence*, No. 1023, 2009 WL 3061975 (N.D. Cal. Sept. 24, 2009) *vacated in relevant part* 539 F.3d 876, 891 (9th Cir. 2010). In that case, the district court held that:

> [t]o the extent the withheld materials reflect communications between [the Office of the Director of National Intelligence and DOJ] and members of Congress in an effort to facilitate *Congress*' own deliberative process to craft legislation to reform FIA, these communications do not fall under the exemption as there is no evidence that they were used in an effort to aid any agency in its *own* deliberative process.

*Id.* at *5. Putting aside whether this case accurately reflects the law of this Circuit or the Ninth Circuit, there is ample evidence in this case that the communications on draft legislation *did* aid DOT in its own deliberative process. As Plaintiff notes, Defendant's affidavits maintain that DOT relied on these communications to "'advise the Secretary and the White House and others in the

Executive Branch about how DOT's programs might be affected by legislation' and to consider agency policy options.'" Pl.'s Cross-Mot. at 28 (quoting Sullivan Decl. ¶ 7). As noted above, both the agency affidavits and the documents themselves identify specific pieces of legislation, specific agency programs, and specific effects that draft legislation would have on those agency programs. As Plaintiff can point to no material in the record that contradicts Defendant's affidavits, the Court concludes that the communications at issue informed and furthered the agency's own policy deliberations.

"Moreover, the disclosure of the information at issue 'would discourage candid discussion within the agency' and therefore undermine the purpose underlying the deliberative process privilege.'" *Id.* at 270 (quoting *Pub. Empls. for Envtl. Responsibility v. EPA*, 213 F. Supp. 3d 1, 11 (D.D.C. 2016)). DOT maintains that "[a]bsent an expectation of confidentiality, DOT would not have been able to effectively deliberate about those issues internally or engage with Leader McConnell's Office to shape legislation to advance DOT's priorities." Sullivan Decl. at ¶ 11. DOT further avers that "public dissemination of these confidential communications between DOT and Leader McConnell's Office regarding transportation policy would reveal internal Executive Branch deliberations about important transportation policy issues related to [particular] infrastructure funding [bills] and FAA reauthorization." *Id.* at ¶ 12. Therefore, and absent any evidentiary material in the record contravening this account, the Court adopts that conclusion.

It is the prerogative of both political branches to unveil draft legislation at the time they choose. Congress made that policy choice by enacting the provisions of FOIA that exempt legislative negotiations between the Office of the President, *cf. Kissinger v. Reporters Comm. For Freedom of the Press*, 455 U.S. 136, 156 (1980) (in case involving foreign affairs advice to President, Office of President exempt from FOIA), and Congress, *Cause of Action v. Nat'l*

*Archives & Records Admin.*, 753 F.3d 210, 212 (D.C. Cir. 2014), from disclosure. Via Exemption 5, the consultant corollary doctrine as applied to Congress is simply a natural extension of FOIA in that regard.

Plaintiff describes one last dire consequence of this conclusion. "DOT's approach here," Plaintiff says, "would extend the consultant corollary doctrine not only to communications with Congress, but also with Exxon Mobil, the Sierra Club, and the U.S. Chamber of Commerce." Pl.'s Cross-Mot. at 32. Yet this case involves *only* interbranch communications, and the Court's holding is explicitly limited to communications between Congressional staff and agency staff on proposed and draft legislation. As the Court has taken pains to explain above, interbranch discussions such as these are somewhat *sui generis* within the consultant corollary doctrine. That they be somewhat different from other types of communications protected by the consultant corollary doctrine is no matter; their redaction complies with and furthers the spirit of Exemption 5.

## III. CONCLUSION

In sum, the Court holds that communications between agency and Congressional staff are exempt from disclosure under FOIA Exemption 5 where (1) the staffers shared a common legislative purpose and (2) the communications furthered the agency's consideration of the particulars of that common legislative purpose. As such, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Cross-Motion for Summary Judgment. An appropriate Order follows this Memorandum Opinion

Dated: January 11, 2022

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge.